**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

AMBER W.,

    Plaintiff,

      v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

Civil Action No. 25-10250 (RK)

**OPINION**

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court on Amber W.'s[1] ("Amber" or "Plaintiff") appeal from the Commissioner of the Social Security Administration's (the "Commissioner") final decision denying Amber's request for disability insurance benefits. (ECF No. 1.) The Court has jurisdiction to review this appeal under 42 U.S.C. § 405(g) and reaches its decision without oral argument under Local Civil Rule 78.1. For the reasons below, the Court **VACATES** and **REMANDS** the Commissioner's decision for further proceedings.

### I.    BACKGROUND

In this appeal, the Court must answer the following question: Did Administrative Law Judge Sharon Allard ("the ALJ" or "Judge Allard") properly analyze, with substantial evidence, Amber's residual functional capacity under the Social Security Act?

#### A.    PROCEDURAL POSTURE

On October 21, 2021, Amber filed an application for a period of disability and disability insurance benefits, alleging an onset date of June 24, 2021. (Administrative Record ("AR") at 90.)[2]

---

[1] The Court identifies Plaintiff by first name and last initial only. *See* D.N.J. Standing Order 2021-10.

[2] The Administrative Record ("Record" or "AR") is available at ECF Nos. 8-1 through 8-28. This Opinion

At the time of the alleged onset date, Amber was 30 years old. (*Id.*) The Social Security Administration (the "Administration") denied the requests both initially, (*id.* at 109–13), and on reconsideration, (*id.* at 116–20). Thereafter, Amber requested a hearing before an Administrative Law Judge ("ALJ"). (*Id.* at 126.) On December 12, 2023, Amber, who was represented by counsel, and Brian Daly, a vocational expert ("VE"), testified at a hearing before Judge Allard. (*Id.* at 46–89.) On May 28, 2024, Judge Allard issued a written decision finding that Amber was not disabled. (*Id.* at 14–39.) The Administration's Appeals Council denied Amber's request to review Judge Allard's decision. (*Id.* at 1–6.) This appeal followed. (ECF No. 1.) The Administrative Record was filed on August 20, 2025. (ECF No. 8.) Amber then filed her moving brief ("Pl. Br.," ECF No. 11), the Commissioner filed an opposition ("Opp.," ECF No. 15), and Amber replied ("Reply," ECF No. 16).

## B.    JUDGE ALLARD'S DECISION

As stated in her May 28, 2024 decision, Judge Allard held that Amber was not disabled under the prevailing Administration regulations. (*See generally* AR at 14–39.) To reach this conclusion, Judge Allard analyzed Amber's application under the five-step process for determining whether an individual is disabled, as set forth in 20 C.F.R. §§ 404.1520(a)(4)(i)–(v). At Step One, Judge Allard found that Amber had not engaged in substantial gainful activity since June 24, 2021, her alleged onset date. (*Id.* at 26 (citing 20 C.F.R. § 404.1571 *et seq.*).)

At Step Two, Judge Allard found that Amber suffers from six severe impairments: migraines, diseases of the esophagus, disorder of the spine, neuropathy, anxiety and obsessive-compulsive disorder, and depressive and bipolar disorder. (*Id.* at 26–27 (citing 20 C.F.R.

will reference only page numbers in the record without the corresponding ECF numbers.

2

§ 404.1520(c)).) Judge Allard concluded that these severe impairments "significantly limit" Amber's ability to perform basic work activities. (*Id.* at 26.) Judge Allard also found that Amber's asthma is a non-severe impairment, as it has "no more than a minimal effect on her ability to perform basic work activities." (*Id.* at 26–27 (citing AR at 1963).)

At Step Three, Judge Allard determined that Amber does not have an "impairment or combination of impairments" that qualified under the Administration's listed impairments. (*Id.* at 27–29 (citing 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526).) As a precursor to Step Four, Judge Allard concluded, based on a review of the evidence in the record, that Amber has the residual functional capacity ("RFC") to perform "light" work, *see* 20 C.F.R. § 404.1567(b), but that any job she performs has to be limited in specified ways:

> The claimant can perform light work (lift and carry up to 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours in an 8-hour day; and sit 6 hours in an 8-hour day). The claimant can occasionally climb ramps and stairs, balance on wet, moving, or uneven surfaces, kneel, stoop, and crouch; but cannot crawl, climb ladders, ropes, or scaffolds, or work around hazards, including moving mechanical parts or at unprotected heights. The claimant can have occasional moderate exposure to temperature extremes of heat and cold, humidity, fumes[,] odors, dusts, gases, and other pulmonary irritants. The claimant can understand and execute simple and routine tasks which are not at an assembly line pace. She can have occasional contact with coworkers, supervisors, and the public, but not with tasks that involve direct customer service. The claimant would be off task 5% of the workday due to her impairments.

(AR at 29–30.) As part of this determination, Judge Allard incorporated extensive evidence from the record. Judge Allard chronicled more than two-and-a-half years of medical progress notes beginning from Amber's June 2021 alleged onset date. (*Id.* at 21–25.) As is most relevant to this appeal, the ALJ discussed Amber's extensive treatment history for her gastroparesis and various gastrointestinal ("GI") complaints. Following G-POEM surgery on May 14, 2021,[3] Amber's GI

---

[3] "Gastric peroral endoscopic myotomy (G-POEM) is a minimally invasive procedure to relieve symptoms of gastroparesis. . . . G-POEM can be an effective treatment for persistent gastroparesis that causes severe symptoms." *G-POEM for Gastroparesis,* Johns Hopkins Med.,

symptoms—typically nausea, vomiting, and headaches—improved for several months, with Amber able to maintain "stable" weight at 153 pounds at the start of the relevant period (an increase from her 2018 weight of 143 pounds). (*Id.* at 20–21 (citing AR at 2537, 2542, 2545); *see also id.* at 2537 (noting in progress note that Amber reported she once weighed as little as 98 pounds because of her GI symptoms).)

While Amber's gastroparesis symptoms reportedly worsened in June 2021, Dr. Robert Coben, Amber's treating gastroenterologist, opined that Amber had had "significant improvement" when she resumed taking Domperidone, a Canadian medication, at January, April, and August 2023 checkups. (*Id.* at 24 (citing AR at 2549, 2555, 2574, 2603).) Amber also continued to maintain a stable weight over the period, although she began visiting a hydration center twice a month to help with her symptoms. (*Id.* at 21–24 (citing or discussing AR at 1975 (155 pounds in January 2022), 3119 (165 in April 2022), 3167 (168 in September 2022), 3250 (168 in January 2023), 2595 (170 in August 2023). 3534 (161 in September 2023), 3474 (160 in December 2023), 3500 (166 in January 2024), 3235 (visits to hydration center).) However, Dr. Coben discussed Amber's reflux, nausea, vomiting, and headache symptoms related to her gastroparesis as recently as December 2023. (*Id.* at 25 (citing AR at 3466).)

Furthermore, Judge Allard outlined the voluminous record regarding Amber's other impairments. For example, the ALJ discussed Dr. Ericka Wong's, Amber's treating neurologist, diagnoses of "mild neuropathy" in Amber's right foot and "mild disc bulges" that both caused occasional "dysesthesia"—tingling discomfort—in her extremities, but also noted Dr. Wong and other examiners' findings that Amber had otherwise normal joints, pain, gait, reflexes, and

---

https://www.hopkinsmedicine.org/health/treatment-tests-and-therapies/g-poem-for-gastroparesis (last visited Mar. 19, 2026).

strength.[4] (*Id.* at 21–25 (citing AR at 2320–67, 2374–92, 2425–29, 2430–74, 3039–43, 3075, 3196, 3335, 3532, 3535, 3200 (Dr. Wong stating that "Overall [Amber's] exam is improving")); *see also id.* at 3528–29 (MRI showed no abnormalities related to tingling).) Examinations of Amber's mental health during the relevant period consistently concluded that she had "normal mood, attention, speech, and behavior," and that she could manage her bipolar and anxiety disorders with medication. (*Id.* at 21–26 (citing AR at 1973–85, 2320–67, 2410, 2414, 2418, 3008–10, 3106–10, 3157, 3335, 3500–03, 3532, 3535).)

The ALJ also discussed other evidence regarding Amber's day-to-day activities, noting that Amber has a driver's license and can drive; could "perform self-care;" graduated with a degree in early childhood education and had a job lined up in May 2023 after previously attending a master's program in August 2020; and can go on a lot of walks.[5] (*Id.* at 20–21, 23 (citing AR at 1588–89, 1973–85, 3335); *see also id.* at 53 (Amber testifying that her highest level of education is an associate's degree in early childhood education).)

Based on her assessment of the record and RFC determination, Judge Allard concluded at Step Four that Amber is not capable of performing her past relevant work as a nursery school attendant or camp counselor. (*Id.* at 37–38 (citing 20 C.F.R. § 404.1565).) At Step Five, Judge Allard, relying on the VE's testimony, concluded that Amber could perform other jobs that existed in significant numbers in the national economy (and that were consistent with her RFC), including "Marker," "Housekeeping Cleaner," and "Laundry Worker." (*Id.* at 38–39 (citing 20 C.F.R. §§ 404.1569, 404.1569a).) Thus, because she could perform such work, Judge Allard concluded

---

[4] The ALJ also discussed  that, per later medical reports, Amber wore a right foot boot in later because of her "peroneal tendonitis of the right foot and ankle." (AR at 25 (citing AR at 3506–07).)

[5] Judge Allard also discussed Amber's daily activities related to taking care of her 6-year-old goddaughter in 2023, as discussed below on page 8. (AR at 31.)

that Amber was not under a disability from June 24, 2021, through the date of the decision. (*Id.* at 39 (citing 20 C.F.R. § 404.1520(g)).)

This appeal concerns Judge Allard's evaluation of Amber's RFC at the precursor to Step Four. More specifically, Amber challenges Judge Allard's analysis of (1) the "total limiting effects" of Amber's diagnosed gastroparesis and (2) several of the prior administrative medical findings ("PAMFs") and medical opinions in the record, though only to the extent those findings and opinions related to Amber's gastroparesis and its effects.[6] (*See* Pl. Br. at 1, 10–21.) Thus, because "all other issues have been waived," the Court restricts its review to these issues. *Torres v. Kijakazi*, No. 21-18424, 2023 WL 6890851, at *2 n.3 (D.N.J. Oct. 19, 2023) (collecting cases).

### 1. Amber's Subjective Testimony

Judge Allard's RFC determination at the precursor to Step Four came after her "careful consideration of the entire record," including the objective medical evidence, opinions, and PAMFs therein. (AR at 29–30.) As is relevant to this appeal, Judge Allard began her analysis by reviewing Amber's hearing testimony, including her GI complaints. (*Id.* at 30.) Amber testified that she has had GI problems for years, limiting her portion size and causing her to spend around 20 minutes in the bathroom after meals vomiting. (*Id.* at 30, 76; *see also id.* at 56 (Amber testifying that she vomits after every meal).) Amber stated that she had received multiple esophagogastroduodenoscopies ("EGDs")[7] and botox injections in the lining of her stomach to diagnose and treat these issues, but that the EGDs and injections stopped in 2020. (*Id.* at 30; *see*

---

[6] Amber does not otherwise challenge Judge Allard's discussion or conclusions relating to her other physical and mental impairments.

[7] "During an EGD procedure (upper endoscopy), a digestive tract specialist (gastroenterologist) uses a scope to view the inside of your esophagus, stomach and duodenum (the upper part of your small intestine)." *EGD Procedure (Upper Endoscopy),* Cleveland Clinic (Nov. 27, 2024), https://my.clevelandclinic.org/health/procedures/22549-egd-procedure-upper-endoscopy.

*also id.* at 57 (Amber testifying that the procedures had to stop "because of the buildup of scar tissue").) Amber testified that in 2021, after she was hospitalized for her GI issues for four days and received an "experimental" G-POEM surgery on her stomach lining. (*Id.* at 30.) Amber testified that, after an observation period, she was able to successfully put on weight, but that the positive effects of the surgery had worn off by her alleged onset date in June 2021. (*Id.* at 30, 59.)

Amber testified that her gastroparesis and nausea are treated with medication: Reglan, Domperidone, Protonix, and pro- and prebiotics.[8] (*Id.* at 60.) Despite her medication regimen, Amber testified that her symptoms have worsened with her continued acid and gastroesophageal reflux disease ("GERD"), which causes her to vomit even when she does not eat. (*Id.* at 30.) Amber asserted that her frequent vomiting makes her dehydrated and that she occasionally passes out. (*Id.*) Because she cannot eat full-sized meals, Amber testified that she eats every two hours and vomits more than seven to ten times a day, with each trip to the bathroom taking around 20 minutes.[9] (*Id.* at 32, 75–76.) Due to her frequent vomiting, Amber testified that she often gets migraines, has to visit a hydration center for IV fluids monthly, and has no enamel on her teeth.[10] (*Id.* at 32, 76–79; *see also id.* at 79 (noting that she had to have a tooth pulled as a result of vomiting frequently).)

Based on this testimony, Judge Allard determined that Amber's "medically determinable

---

[8] Judge Allard suggests that Amber testified at the hearing that she takes Zofran, a different anti-nausea medication, not Reglan. (AR at 30.) Amber did not mention Zofran at the hearing, only Reglan. (*See id.* at 60.) She did, however, state as part of her application for disability benefits that she was taking Zofran in October 2021. (*Id.* at 247–48.)

[9] Judge Allard notes that Amber testified she has had to "crawl out of the bathroom" given the length of her bathroom visits. (AR at 32.) This specific detail appears to be related to Amber's neuropathy or other foot-related impairments, (*id.* at 22–25, 28), which are not at issue on this appeal. (*Id.* at 78 ("I can only sit on the toilet for three to five minutes and then my feet go numb. I have had to crawl out of the bathroom multiple times."); *see also* Pl. Br. at 2–3 (not discussing these crawling incidents in recounting testimony regarding GI symptoms).)

[10] Amber also testified that her gastroparesis symptoms inhibited her ability to work, as her previous boss told her that she "couldn't be in the bathroom when [she] was in the classroom." (AR at 79.)

7

impairments could reasonably be expected to cause the alleged symptoms." (*Id.* at 32.) However, she found Amber's "statements concerning the intensity, persistence and limiting effects" of her symptoms "not entirely consistent with the medical evidence and other evidence in the record." (*Id.*) As is relevant to this appeal, Judge Allard concluded that Amber's testimony about her bathroom visits was not consistent with the record. For example, Judge Allard found that when Amber was "describing her daily activities" during her hearing testimony, she "at no time included any reference to bathroom visits." (*Id.*) Judge Allard summarized Amber's testimony about her daily activities, particularly related to her caretaking of her 6-year-old goddaughter in 2023:

> [Amber] would brush he[r] teeth, tell her goddaughter to get up and get ready, and take a shower or wash up. [Amber] would sit in a chair in her room because she was tired from the shower, and then get dressed, take her medications, and take her goddaughter to school. . . . [Amber] would return home and nap for an hour and a half. She would check her goddaughter's room for 5 minutes and then do arts and crafts for 15 minutes and read for 10 minutes. . . . [Amber] would do homework with her goddaughter, go for a walk for 5 to 10 minutes, watch her goddaughter play games, and make sure that she reads. She would care for her goddaughter from 3 pm until 9:30 pm.

(*Id.* at 31.) The ALJ concluded that Amber's "testimony evidences the ability to work in 2-hour increments with regular scheduled breaks." (*Id.* at 32.)

Moreover, Judge Allard concluded that Amber's testimony about the severity of her GI symptoms was inconsistent with the progress notes of Dr. Robert Coben, Amber's treating gastroenterologist. (*Id.*; Pl. Br. at 3–4.) Although Amber's testimony regarding her treatment history, hospital visits, and the nature of her symptoms—"a lot of nausea and vomiting"—were all consistent with Dr. Coben's progress notes, (AR at 32 (citing AR at 3225, 3235, 3239, 3416–65)), the ALJ flagged that Dr. Coben's notes did not "indicate that [Amber] was vomiting 8-10x per day," either before or after she began taking Domperidone, which improved her gastroparesis, (*id.* (citing AR at 2549, 2555, 2578, 2584, 2590, 2603, 3225, 3235, 3239, 3466, 3474)). Judge Allard also noted that Amber had "not had significant weight loss," which may reasonably be expected

8

as Amber once weighed under 100 pounds purportedly because of her GI issues and her claim of serial, daily vomiting. (*Id.*)

Judge Allard also noted that other progress notes undermined Amber's testimony regarding the severity of her nausea-induced migraines and inability to work. (*Id.* at 33 (citing AR at 3002–398).) In particular, Judge Allard noted that various medications—including Domperidone in 2023—had reduced the frequency and severity of Amber's headaches over time. (*Id.* (citing AR at 3286, 3289–90).) Finally, Judge Allard cited a May 16, 2023 progress note, according to which Amber reported that she had just graduated with a degree in early childhood education and had a job lined up. (*Id.* (discussing AR at 3335).) Judge Allard concluded that "[t]he fact that the claimant was able to complete her degree suggests that her GI symptoms and headaches, as well as her other physical and psychiatric impairments, were not completely disabling." (*Id.*)

### 2. PAMFs and Medical Opinions in the Record

Judge Allard next evaluated the persuasiveness of the medical opinions and PAMFs in the record.[11] As is relevant to this appeal, Judge Allard assessed the opinions of state agency doctors, consultative examiner Dr. Juan Carlos Cornejo, and Amber's gastroenterologist Dr. Coben. (*Id.* at 34–36; Pl. Br. at 10–12.) Dr. Hortensia Kelly and Dr. James Greco, the relevant state agency doctors, each concluded that Amber was capable of performing "light" work. (AR at 34 (citing AR at 91–98, 100–08).) Each opined that Amber was physically capable of performing "postural functions" either frequently or occasionally,[12] but that Amber needed to avoid "exposure to

---

[11] Amber does not challenge Judge Allard's assessments of (1) Dr. Jocelyn Fierstien and Dr. Andrea Chapman, state agency examiners who assessed Amber's mental health, (2) Dr. Stephanie Nahas and Dr. Sadia Qazi, two of Amber's treating physicians, or (3) the third-party function reports of Ms. Lillie Mae Wicker-Williams, Amber's mother. (AR at 34–37 (citing AR at 91–98, 100–08, 258–66, 297–304, 2368–69, 3545–46, 3609–11); Pl. Br. at 10–21.) Accordingly, Amber has forfeited her challenge to Judge Allard's assessment of those opinions. *See Torres*, 2023 WL 6890851, at *2 n.3 (collecting cases).

[12] Dr. Kelly concluded that Amber could frequently balance, but could only occasionally climb ramps, stairs, ladders, ropes, or scaffolds, and only occasionally stoop, kneel, crouch, or crawl. (AR at 95.) Dr.

9

extreme cold, . . . humidity, and fumes, odors, dusts, gases, poor ventilation, and other respiratory irritants."[13] (*Id.* (citing AR at 91–98, 100–08).) Although both reports noted Amber's "severe" "digestive system" impairments, neither discussed her vomiting symptoms in reaching their respective conclusions about Amber's ability to work. (*Id.* at 93–94, 102–03.)

Judge Allard found the state agency opinions partially persuasive. Judge Allard concluded that their "light work" opinions were persuasive, because they were consistent with other evidence and reports in the record regarding Amber's back and nerve health and physical capabilities. (*Id.* at 34 (citing AR at 294, 2425–29, 3196, 3200).) Judge Allard did conclude, however, that Dr. Kelly and Dr. Greco's opinions that Amber could "climb ladders, ropes, and scaffolds occasionally" were not persuasive given her lower back and foot issues. (*Id.*) The ALJ did not address that the state agency doctors had not discussed Amber's GI symptoms.

Judge Allard also evaluated Dr. Cornejo's consultative opinion for the Commissioner. Dr. Cornejo's conclusions largely focused on Amber's physical abilities: Dr. Cornejo found that Amber could walk, stand, and sit with reasonable breaks; had normal balance, hand functionality, and range of motion; "would be able to do sedentary activity with needed breaks"; but "would have difficulty with physically exerting activity." (*Id.* at 35 (quoting AR at 1978).) Although Dr. Cornejo noted Amber's GERD as a diagnosis in his report, he did not discuss it or Amber's gastroparesis in his analysis. (*Id.* at 1978.)

Judge Allard found Dr. Cornejo's opinion partially persuasive "to the extent that it

---

Greco concluded that Amber could kneel an "unlimited" amount, could balance and climb stairs and ramps frequently, but could only occasionally stoop, crouch, crawl, or climb ladders, ropes, and scaffolds. (*Id.* at 104.)

[13] Dr. Kelly opined that Amber had to avoid "concentrated" exposure to extreme cold and humidity but had to avoid "even moderate exposure" to the remaining maladies listed above. (AR at 34 (citing AR at 91–98).) By contrast, Dr. Greco opined that Amber only had to avoid "concentrated" exposure to the entire list, as well as "extreme heat." (*Id.* (citing AR at 100–08).)

indicates that [Amber] retains an RFC for light work." (*Id.* at 35.) However, the ALJ found Dr. Cornejo's opinion that Amber "is able to do sedentary activity with needed breaks [was] not persuasive, since it is not supported by his examination findings," which found "unremarkable" limitations in Amber's range of motion, strength, reflexes, and sensation. (*Id.* (citing AR at 1976–77).) Judge Allard also found Dr. Cornejo's conclusion that Amber was limited to sedentary work inconsistent with a separate progress note from May 16, 2023 that stated that Amber was "going on a lot of walks." (*Id.* (citing AR at 3335).)

Finally, Judge Allard evaluated Dr. Coben's opinion. Dr. Coben found that Amber's gastroparesis caused "constant vomiting, nausea, and abdominal/chest pain." (*Id.* at 36 (citing AR at 2370–73, 3495–98).) Dr. Coben suggested that these symptoms limited Amber's physical abilities: Amber could "never lift and carry 10 pounds"; could "walk only 1 city block without rest or severe pain"; and could sit, stand, and walk "less than 2 hours in an 8-hour day." (*Id.*) Dr. Coben concluded that, because of Amber's frequent vomiting, she would "need a job that permits ready access to a restroom and would need to take more than 10 restroom breaks during an 8-hour day."[14] (*Id.*)

Judge Allard found Dr. Coben's opinion unpersuasive, "as it [was] not supported by his own evidence, it [was] overly broad and restrictive, and it [was] inconsistent with other evidence in the record." (*Id.*) In particular, Judge Allard noted that Dr. Coben's own progress notes from January 19 to August 9, 2023 indicated that Amber's "gastroparesis was better with

---

[14] Although not at issue on this appeal, Dr. Coben also opined that Amber's symptoms "would constantly interfere with the attention and concentration needed to perform even simple work" and listed a number of limitations on Amber's ability to perform certain jobs. (AR at 36 (summarizing Dr. Coben's conclusions that Amber "would be unable to perform jobs involving public contact; routine, repetitive tasks at a consistent pace; detailed or complicated tasks; strict deadlines; close interaction with coworkers/supervisors; fast-paced tasks (e.g., production line); and exposure to work hazards (e.g., heights or moving machinery)") (citing AR at 2370–73, 3495–98).)

11

Domperidone." (*Id.* (discussing AR at 2549–604); *see also id.* at 2579 (noting on April 6, 2023 that Amber still had "gastroparetic symptoms and lack of appetite" but was "feeling better since restarting Domperidone"), 2590 (noting on August 9, 2023 that Amber has "[n]o issues with Domperidone. Seems to help").) Judge Allard also found that Dr. Coben's conclusion that Amber could only walk one city block was inconsistent with Amber's May 16, 2023 statement that she was going on "a lot" of walks. (*Id.* (citing AR at 3335).)

Judge Allard concluded, "[b]ased on the above" analysis of the medical opinions and testimony in the record, that Amber had the residual functioning capacity to perform "light" work, subject to additional limitations. (*Id.* at 37.) The portions of the ALJ's RFC determination (quoted in full above) most relevant to this appeal are Judge Allard's conclusion that Amber could perform light work, and her limitation that Amber "would be off task 5% of the workday due to her impairments." (*Id.*)

## II.    **LEGAL STANDARD**

### A.    STANDARD OF REVIEW

The Court reviews the "final decision of the Commissioner of Social Security" to determine whether the Commissioner's findings are "supported by substantial evidence." 42 U.S.C. § 405(g). In the event that the Appeals Council denies a claimant's request for review, "the ALJ's decision is the Commissioner's final decision." *Matthews v. Apfel*, 239 F.3d 589, 592 (3d Cir. 2001). Substantial evidence is "more than a mere scintilla but may be somewhat less than a preponderance of the evidence." *Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (quoting *Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005)). Put differently, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999)). This

evidentiary threshold "is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019).

The scope of the Court's review of the ALJ's decision is "quite limited." *Rutherford*, 399 F.3d at 552. On review, the Court may not "re-weigh the evidence or impose [its] own factual determinations." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). "Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently." *Fargnoli v. Massanari*, 247 F.3d 34, 38 (3d Cir. 2001). The court must "review the record as a whole to determine whether substantial evidence supports a factual finding." *Zirnsak*, 777 F.3d at 610 (citing *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999)). "Since it is apparent that the ALJ cannot reject evidence for no reason or for the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter v. Harris,* 642 F.2d 700, 706–07 (3d Cir. 1981) (citation omitted).

### B.    ESTABLISHING ELIGIBILITY FOR DISABILITY INSURANCE BENEFITS AND SUPPLEMENTAL SECURITY INCOME

A claimant may establish disability under the Social Security Act by proving they are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The ALJ applies a well-established "five-step sequential evaluation process," which requires considering whether the claimant:

> (1) is engaged in substantial gainful activity; (2) suffers from an impairment or combination of impairments that is "severe"; (3) suffers from an impairment or combination of impairments that meets or equals a listed impairment; (4) is able to perform his or him

> past relevant work; and (5) is able to perform work existing in significant numbers in the national economy.

*McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004) (citing 20 C.F.R. §§ 404.1520(a)–(f)). The claimant bears the burden at the first four steps, at which point it shifts to the Commissioner at Step Five. *Hess v. Comm'r Soc. Sec.*, 931 F.3d 198, 201 (3d Cir. 2019).

## III.   <u>DISCUSSION</u>

To support her request for remand under 42 U.S.C. § 405(g), Amber argues that Judge Allard's RFC determination at the precursor to Step Four improperly analyzed the various medical opinions and subjective testimony discussed above. (Pl. Br. at 12–21.) Amber asserts that Judge Allard's determined RFC did not incorporate the "total limiting effects" of her gastroparesis, "particularly the effects of her nausea and vomiting episodes." (*Id.* at 5 (quoting 20 C.F.R. § 404.1545(e)).) Specifically, Amber argues that Judge Allard's asserted RFC—in essence concluding that Amber was capable of light work with 5% off-task time each workday, subject to other limitations, (AR at 29–30)—was not supported by substantial evidence in the record, (Pl. Br. at 12–21; *see also id.* at 19 n.18 (arguing that the RFC limitation that Amber would be "off task 5% of the workday due to her impairments" was not supported by substantial evidence).)

ALJs often consider the percentage of each workday that a person would be "off task," i.e., not performing work, when determining a claimant's RFC. As part of their review under 42 U.S.C. § 405(g), District Courts assess whether such a percentage is supported by substantial evidence. *See, e.g., Russell v. Dudek*, No. 24-350, 2025 WL 1257972, at *9–10 (M.D. Pa. Apr. 30, 2025) (collecting cases) ("The ALJ's omission of any meaningful discussion regarding off-task time or absenteeism related to the plaintiff's IBS and restroom needs deprives the Court of the ability to conduct meaningful review."). Moreover, such an omission in analysis can constitute harmful error: The off-task percentage affects an individual's ability to seek employment—indeed, as

further explained below, the VE in this case testified that an off-task percentage of 15% or greater "would preclude competitive employment in the national economy" while an off-task percentage of 5% or 10% would not. (AR at 85–87.)

Although the evidentiary threshold for substantial evidence "is not high," *Biestek*, 587 U.S. at 103, RFC determinations—including for findings regarding off-task time—must still be supported by substantial evidence in the record, *see, e.g., Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017) (explaining that "[a]n ALJ need not address every piece of evidence, but he must establish a logical connection between the evidence and his conclusion" and remanding where ALJ had not established that connection between record evidence and off-task percentage calculation). The ALJ must demonstrate why she chose a specific percentage of off-task time "rather than some other duration and frequency," particularly when "there is evidence in the record to the contrary." *Cosnyka v. Colvin*, 576 F. App'x 43, 46 (2d Cir. 2014) (vacating and remanding for further RFC analysis of off-task time). Because the ALJ is required to ensure "sufficient development of the record and explanation of findings to permit meaningful review," *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004), this omission in analysis makes it "impossible for the reviewing Court to determine if the ALJ's [off-task] assessment . . . is supported by substantial evidence without knowing the basis for the figure," *McNeely v. Saul*, No. 20-158, 2020 WL 5648214, at *8 (S.D. W. Va. Sept. 4, 2020), *report and recommendation adopted*, 2020 WL 5649483 (S.D. W. Va. Sept. 22, 2020). *Cf. Borchers v. Comm'r of Soc. Sec.*, No. 19-13670, 2020 WL 4048050, at *8 (D.N.J. July 20, 2020) (affirming ALJ's 5% off-task finding where ALJ "properly supported" the percentage with evidence in the record).

Where evidence in the record—particularly from a VE—suggests that a higher percentage of off-task time would preclude a plaintiff from acquiring employment, an ALJ's insufficient

analysis of off-task time constitutes harmful error requiring remand. *See, e.g., Cosnyka*, 576 F. App'x at 46; *McNeely*, 2020 WL 5648214, at *8–10 (collecting cases and concluding that ALJ had not sufficiently explained off-task percentage given plaintiff's gastritis and gastroparesis); *Dowling v. Comm'r of Soc. Sec.*, 986 F.3d 377, 389 (4th Cir. 2021) ("Obviously, the need to visit the bathroom many times throughout the day impacts one's ability to work. . . . On remand, the ALJ should evaluate the frequency at which Appellant needed to use the bathroom and analyze how that restriction impacted her ability to work."), *superseded on other grounds by regulation*, 20 C.F.R. § 404.1520c(a), *as recognized in Drumgold v. Comm'r of Soc. Sec.*, 144 F.4th 596, 604 (4th Cir. 2025); *Lanigan*, 865 F.3d at 563 ("[T]he ALJ made no effort to build an accurate and logical bridge between the 'no more than 10%' [off-task] finding and [potentially supportive evidence in the record]." (citation and quotation marks omitted)); *Russell* , 2025 WL 1257972, at *9–10 (collecting cases); *Jeffrey B. v. Saul*, No. 20-1090, 2021 WL 797920, at *3 (D. Md. Mar. 2, 2021) ("The lack of any explanation as to how the ALJ calculated this percentage is significant because 'a one percent increase could preclude competitive employment.'" (quoting *Petry v. Comm'r of Soc. Sec.*, No. 16-464, 2017 WL 680379, at *2 (D. Md. Feb. 21, 2017))).

Judge Allard provided no specific analysis or basis as to how she reached this 5% off-task figure as opposed to some other percentage. (*See* AR at 29–37.) Despite acknowledging the severity of Amber's "diseases of the esophagus" like gastroparesis and concluding that Amber's extensive GI symptoms "significantly limit" her ability to "perform basic work activities," (*id.* at 26), Judge Allard's only reference to an amount of break time Amber would need during the workday was that Amber's testimony "evidences the ability to work in 2-hour increments with regular scheduled breaks," (*id.* at 32). Judge Allard did not clarify what portion of Amber's testimony supported this calculation, nor did she explain the meaning or length of "regular

16

scheduled breaks" except to later conclude, again without pointing to record evidence, that Amber "would be off task 5% of the workday."[15] (*Id.* at 30.) When Judge Allard concluded that the appropriate amount of off-task time was 5% of the workday she did not explain why this percentage, and not some other amount, was sufficient to accommodate Amber's GI issues, or critically, how she arrived at the 5% mark.[16]

Instead, Judge Allard's analysis of Amber's frequent bathroom visits merely *discredits* Amber's offered evidence as unpersuasive. Discrediting Amber's testimony and the various medical opinions in the record is not *affirmative* evidence supportive of Judge Allard's 5% figure. As explained in detail above, Judge Allard concluded that Amber's testimony that she vomits "8-10x per day spending 20 minutes in the bathroom each time" was not consistent with (1) her other testimony about her daily activities, which did not mention bathroom visits, (2) Dr. Coben's progress notes that, while stating that Amber had "a lot of nausea and vomiting," did not indicate the frequency of bathroom visits Amber specified, or (3) the "fact that [Amber] was able to complete her degree" in early childhood education.[17] (*Id.* at 32–33.) The Court notes, in addition,

---

[15] Judge Allard's statement that Amber's testimony indicated an "ability to work in 2-hour increments with regular scheduled breaks" is not specifically mentioned in her final RFC determination. (AR at 29–30, 32.)

[16] It is also unclear if the specified off-task time is related to Amber's GI health. In formulating Amber's RFC, Judge Allard concluded that Amber would require the specified off-task time "due to her impairments," not specifying which of the six severe impairments required this time, and how. (AR at 30, 37.) In fact, other testimony in the record suggested that Amber would need breaks related to her back health, one of her other severe impairments. (*Id.* at 26 (listing "disorder of the spine" as one of Amber's severe impairments at Step Two), 36–37 (one of Amber's treating physicians specifying that she needed to change positions frequently and "walk around every 30 minutes").) On remand, as part of explaining the reasoning for her off-task determination, the ALJ should clarify which of Amber's "impairments"—or combination of impairments—necessitate off-task time.

[17] While Judge Allard states that "Dr. Coben did not note that [Amber] was vomiting as often as alleged," (AR at 32), Dr. Coben did opine that Amber would "need a job that permits ready access to a restroom and would need to take more than 10 restroom breaks during an 8-hour day," (*id.* at 36 (citing AR at 3495–98)). Judge Allard herself cites to this opinion, which she found unpersuasive because of Amber's improved symptoms while taking Domperidone. (*Id.* (discussing AR at 2549–605).) Even if Judge Allard found this opinion unpersuasive, it is inconsistent with her suggestion that "Dr. Coben did not note that [Amber] was vomiting as often as alleged." (*Id.* at 32.) Nonetheless, Dr. Coben's check-box, fill-in-the-blank form likely

17

the fact that Amber provided sole caretaking of her godchild in the morning and then from 3:00 pm to 9:30 pm daily may also be evidence that she is not disabled. (*Id.* at 31.)

The ALJ is entitled to broad deference from this Court in her assessments of the persuasiveness of the medical sources and claimant's testimony. *See Chandler*, 667 F.3d at 359; *Morales*, 225 F.3d at 316. However, because Judge Allard's did not adequately support her 5% off-task conclusion with evidence from the record, the Court is constrained to remand for further development of the record and additional analysis. *See Lanigan*, 865 F.3d at 563 (remanding where ALJ had not "buil[t] an accurate and logical bridge" between off-task percentage and evidence in the record). Even if Judge Allard could have reasonably concluded that Amber and Dr. Coben's asserted frequency of bathroom visits was *too much* or that those visits were *too long* (assuming there was substantial evidence to do so),[18] she did not analyze why her alternative conclusion of only 5% of the workday was *instead* appropriate. *Russell*, 2025 WL 1257972, at *9 ("Our view is supported by many other courts who have found that remand is necessary when an ALJ fails to include appropriate restrictions in a claimant's RFC where the evidence demonstrates a need for frequent restroom breaks.").

Based on testimony from the VE, this error was not harmless. Incremental differences in off-task percentage, per the VE, had a direct impact on Amber's ability to perform work within the national economy. (*See* AR at 85–87); *see also McNeely*, 2020 WL 5648214, at *8 ("[T]he ALJ's failure to explain the specific [off-task percentage] limitation cannot be considered harmless in light of the VE's testimony that a relatively small increase would preclude competitive

---

constitutes "weak evidence at best." *Fullen v. Comm'r of Soc. Sec.*, 705 F. App'x 121, 125 (3d Cir. 2017).

[18] The Court declines to address whether Judge Allard's credibility analysis of the medical opinions and Amber's testimony was supported by substantial evidence. *See Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir. 2003).

employment."). Specifically, at the December 12, 2023 hearing, the VE testified that jobs existed in sufficient numbers for a person to find employment if she was off-task 5% of the time, (AR at 85–86), and 10% of the time, (*id.* at 87)—but not 15% of the time, (*id.*). Needing to be off-task 15% of the workday "would preclude [Amber's] competitive employment in the national economy on a full-time basis." (*Id.*)

Accordingly, for the reasons stated, the Court is constrained to remand this case to the Commissioner for further proceedings. The Court expresses no opinion as to whether Amber is disabled under the relevant regulations, or whether Judge Allard's findings regarding Amber's other impairments and capacity for light work are supported by substantial evidence. *Boone v. Barnhart*, 353 F.3d 203, 211 n.19 (3d Cir. 2003); *Jeffrey B.*, 2021 WL 797920, at *4. On remand, the ALJ should develop the record to substantiate any future off-task time finding with corroborative, objective medical evidence from Amber's treating and consultative physicians, including objective medical tests. That is, the ALJ should assess, whether in support of or to discount Amber's testimony about her off-task time, the discussed medical evidence—*see supra* pages 3–5—related to Amber's symptoms, medication, surgical history, stable weight from 2021 to 2024, the state of her teeth and gums, or otherwise to determine an appropriate amount of off-task time for Amber's gastroparesis.

To the extent possible, the parties should solicit medical opinion evidence that reconciles this colorably inconsistent evidence on Amber's gastroparesis with her need for bathroom visits and makes supported findings as to needed break length and frequency. Furthermore, the ALJ should inquire—if the VE's subject matter expertise and available, reliable data allow it—about the possibility of more sedentary, remote work options for Amber to accommodate her symptoms, particularly in light of her remote work experience, age, and education level.

19

## CONCLUSION

Having reviewed the record as a whole, the Commissioner's decision is **VACATED**, and this case is **REMANDED** for further proceedings. An appropriate Order follows.

_____
**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

Dated: March 25, 2026

20